HAWAIIAN GOVERNMENT vs. A. J. CARTWRIGHT, Trustee of Estate of Queen Emma : and C. R. BISHOP, S. M. DAMON, C. M. HYDE, C. M. COOKE and J. O. CARTER, Trustees of Estate of Mrs. B. P. Bishop.

In Equity. Before Judd, C.J.

Decision Rendered June 18, 1890. Not hitherto reported.

Under a Statute providing for the payment by the Hawaiian Government of such mortgages upon the Crown Lands as should remain unsatisfied after the exhaustion of the private estate of the late King (K. IV.) and that such lands should thereafter be inalienable, the Minister of Finance paid a mortgage on certain private land of the King, under the mistaken idea that it was Crown Land and that the private estate of the King had already been exhausted.

Held, that the Hawaiian Government had a lien on the private land to the extent of its value at the time the mortgage was released.

### Decision of Judd, C.J.

This bill was filed February 22, 1884, by J. M. Kapena, then Minister of Finance, against Queen Dowager Emma and Hon. Mrs. B. Pauahi Bishop.

A demurrer which raised the vital questions involved was overruled by me July 23, 1885. At that date both the respondents had deceased, and upon suggestions thereof the parties above named in the caption of this case have been substituted for the original respondents. The plaintiff has been changed since passage of the Act of September 6, 1888, to provide for the bringing of suits by or against the Hawaiian Government—to the Hawaiian Government.

Following is the bill.

### Bill.

The petition of John M. Kapena presented to this Honorable Court respectfully shows :

1. That the defendant, Her Majesty Emma Kaleleonalani, Queen Dowager, is one of the heirs-at-law of His Majesty, the late King Kamehameha IV.

2. That the defendant, Bernice Pauahi Bishop, is the heir-at-law and devisee of H. H. Ruth Keelikolani, deceased, who in her lifetime was the heir of His Majesty, the late Kamehameha V., and as such the heir of the one undivided half of the estate of his said Majesty, the late King Kamehameha IV.; that her said Majesty Emma Kaleleonalani, Queen Dowager, and the said Bernice Pauahi Bishop, are the only heirs of said estate of His Majesty the late King Kamehameha IV.

3. That Charles R. Bishop is the husband of said Bernice Pauahi Bishop, all of Honolulu, Island of Oahu, in the Kingdom of the Hawaiian Islands.

4. That your petitioner is the Minister of Finance of said Kingdom, and that as such Minister of Finance, for and on behalf of the King and the people of said Kingdom of the Hawaiian Islands, he asserts the demand and asks for the relief hereinafter set forth.

5. That under and by virtue of an Act of the Legislature of the said Kingdom, entitled "An Act to Relieve the Royal Domain from encumbrances and to render the same inalienable," approved the third day of January, A. D. 1865, the then Minister of Finance was authorized to issue certain bonds not exceeding in amount the sum of thirty thousand dollars, for the purpose of paying sundry encumbrances upon the Royal Domain then existing after the private estate of his said Majesty the late King Kamehameha IV. had been sold and the proceeds of such sale had been applied to the payment of said incumbrances so far as the said proceeds might avail.

6. That all the estate of his said Majesty the late King Kamehameha IV. was sold for the purpose of applying the proceeds of such sale to the payment of said mortgages, except those certain parcels and pieces of land described as follows, to wit:

First. All that tract or parcel of land situated in the city of Honolulu, Island of Oahu, bounded and described as follows: Commencing at the "Merchant's Exchange," so called, and extending along Merchant street 101 10-12 feet toward the office of the Polynesian office $97\frac{1}{4}$ feet, thence along the lot formerly

occupied by the " Varieties Theatre " 85 9-12 feet to a small fig, along the same lot to the lot of Utai and Ahee, thence to lot of the said " Merchant's Exchange " and along said lot to place of commencement ; being the estate ordinarily designated as the " Honolulu · House," together with the buildings, structures, privileges and appurtenances thereon situated and thereto belonging.

(Then follows descriptions of some six other pieces of land.)

Which said above described pieces and parcels of land were not sold as prescribed in the said Act of the Legislature, for the reason that said described premises were held and believed to be part of the Royal Domain and not part of the estate of his said Majesty the late King Kamehameha IV.

7.   That said premises in truth and in fact were not part of the Royal Domain, but were lands belonging to the estate of His Majesty the late King Kamehameha IV.

8.   That his said Majesty the late King Kamehameha IV. in trust for himself granted by his certain deed the said premises (hereinbefore first described) to one Wm. Webster, with a view of mortgaging the same, a copy of which deed is hereto attached, marked Exhibit A and made part hereof.

9.   That thereafter the said Wm. Webster as such grantee, but for the use of his said grantor, made his certain indenture of mortgage conveying to one J. Mott-Smith the said first above described premises, a copy of which indenture of mortgage is hereto attached, marked Exhibit B and made part hereof.   That by said mortgage the said mortgagor undertook to secure to the said mortgagee the payment of the sum of six thousand dollars, with interest thereon at the rate of ten per centum per annum.

10.   That the then Minister of Finance, believing that in conformity to the said Act of the Legislature hereinbefore mentioned all the private property of the estate of his said Majesty the late King Kamehameha IV. had been sold in accordance with the provisions of the said Act of the Legislature, issued the bonds of the Hawaiian Government amounting to the sum of twenty-seven thousand dollars and paid said sum realized from said bonds to various persons then having liens and mortgages upon

the said Royal Domain and extinguished and released said liens and mortgages.

11. That among other liens and mortgages so paid by the then Minister of Finance, the lien and mortgage made by said Wm. Webster to the said J. Mott-Smith, amounting to the sum of seven thousand three hundred and thirty-two ($7,332) dollars upon the premises hereinbefore first described was by said Minister of Finance paid and discharged.

12. That in consideration of the payment by the said Minister of Finance of said liens and mortgages, and in the belief that the said premises were part of the Royal Domain and not part of the estate of his said Majesty the late King Kamehameha IV., one Robert Moffitt, executor of the last will and testament of the said Wm. Webster, then deceased, made his certain deed of conveyance to John O. Dominis, Ferdinand W. Hutchinson and Charles C. Harris, the then duly qualified and acting Crown Land Commissioners, and that the said Crown Land Commissioners and their successors in office have ever since held and now hold said premises as part of the Crown lands. That said last mentioned deed is hereto annexed, marked Exhibit C and made part hereof.

13. That all the said above described premises were at all times, until the date of the various judgments hereinafter mentioned, by the parties to this action and the people generally believed to be and were reputed to be a part of the Royal Domain, or Crown Lands so-called, and not lands belonging to the estate of his said Majesty the late King Kamehameha IV.

14. That under and by virtue of the aforesaid Act of the Legislature the possession of the Royal Domain or Crown Lands so-called was vested in the said Crown Land Commissioners and has been held by them and their successors in office ever since the passage of said Act, including the pieces and parcels of land hereinbefore in paragraph 6 of this bill particularly described.

15. That by the provisions of said Act of the Legislature one-fourth of the annual revenues derived from the said Royal Domain or Crown Lands so-called should be set apart and ap-

plied to the payment of the interest upon the bonds issued under said Act, and any excess thereof should be applied to the payment of the principal of said bonds.

16.   That no part of the principal due upon said bonds or of the interest due thereon has ever been paid.

17.   That after the issuing of said bonds and the payment of the said sum of twenty-seven thousand dollars by the then Minister of Finance, to wit, on the 12th day of March, A. D. 1881, Her Majesty, Emma Kaleleonalani, Queen Dowager, defendant herein, did commence her certain action in this Honorable Court and filed her complaint therein against the Crown Land Commissioners, praying among other things in said complaint that she recover one undivided moiety of, in and to the premises hereinbefore described, as heir at law of His said Majesty the late King Kamehameha IV.   That such proceedings were thereafter had in such action that a judgment was rendered against the Crown Land Commissioners and in favor of Her said Majesty Queen Emma Kaleleonalani for the possession of said premises.

18.   That after the issuing of said bonds and the payment of said sum of twenty-seven thousand dollars by the then Minister of Finance, to wit, on the 1st day of March, A. D. 1883, Her late Highness Ruth Keelikolani did commence her certain action in this Honorable Court and filed her complaint therein against the Crown Land Commissioners, praying among other things that she recover possession and have restitution and be adjudged to have the title in fee of and to the one undivided moiety of the premises hereinbefore described as heir of the estate of His said Majesty the late King Kamehameha IV. by way of descent, and that such proceedings were thereafter had in said action that the defendant, C. R. Bishop, and one R. W. Meyer were thereafter and upon the decease of the said plaintiff, Ruth Keelikolani, substituted as plaintiffs in her place, and that thereafter this Honorable Court rendered its judgment therein against the Crown Land Commissioners and in favor of the plaintiffs for the restitution and possession of the undivided moiety of said premises.

19.   That after the issuing of said bonds and the payment of the said sum of twenty-seven thousand dollars by the then Minister of Finance, to wit, on the 6th day of March, A. D. 1883, the defendants herein commenced their certain action in this Honorable Court, and filed their complaint therein against the Crown Land Commissioners, praying among other things that this Honorable Court make its decree, decreeing that said defendants therein, the Crown Land Commissioners, convey all their right, title and interest in and to the premises hereinbefore described to the plaintiffs therein, the defendants in this action, and that the said defendants in this action be put in possession of said premises; and that such proceedings were thereafter had in the said action that a decision was made granting the relief prayed for in said action by the plaintiffs therein, the defendants in this action.

Wherefore your petitioner prays that this Honorable Court make its decree :

1.   Decreeing that the said sum of twenty-seven thousand dollars is chargeable upon the premises in this petition described.

2.   That your petitioner for and in behalf of the King and the people of the Hawaiian Islands is entitled to have and recover the said sum of twenty-seven thousand dollars, or as much thereof as may be realized from a sale of the said premises.

3.   That in equity a lien exists in favor of your petitioner upon the said premises.

4.   That said premises be sold in such manner as this Honorable Court may direct, and that out of the proceeds of such sale there shall be paid to your petitioner, as Minister of Finance of this Kingdom, after deducting costs and expenses of said sale, the sum of twenty-seven thousand dollars, and that the surplus, if any, arising from such sale be paid to the defendants herein·

5.   That your petitioner have such other and further relief as may be meet in the premises and consistent with equity.

6.   That it may please this Honorable Court to order process o issue summoning the said defendants to appear and answer

this petition at such time and place as the law of the Kingdom and the practice of the Court directs.

— ———

The following answer was filed :

ANSWER.

The joint and several answers, by leave of Court herein had and obtained, of A. J. Cartwright, trustee of the estate of the late Emma Kaleleonalani, and Charles R. Bishop, S. M. Damon, C. M. Cooke, C. M. Hyde and J. O. Carter, trustees of the late Bernice Pauahi Bishop, substituted defendants to the bill of complaint of the Hawaiian Government, substituted plaintiff in the place of John M. Kapena.

These defendants now and at all times hereafter saving and reserving to themselves all manner of benefits and advantage of exception to the many errors and insufficiencies in the bill of complaint contained, for answer thereunto say, or unto so much or such parts thereof as these defendants are advised is material for them to make answer unto, they answer and say :

1st.   That they admit that the late Queen Dowager Emma Kaleleonalani·and the late Bernice Pauahi Bishop were the only heirs of the estate of His Majesty the late King Kamehameha IV., as in said bill of complaint alleged.

2nd.   That they admit the enactment by the Legislature of the act set forth in the fifth subdivision of said bill of complaint, but say that the bonds therein mentioned were authorized to be issued to the Commissioners of Crown Lands, and the payment of the same was made a charge upon the revenues of the Crown lands.

3rd.   That they admit so much of the sixth subdivision of said bill of complaint as sets forth the real estate not sold for the purpose of paying debts of his late Majesty Kamehameha IV., but do not admit that portion of said subdivision six which alleges that said premises so described were held and believed to be part of the Royal Domain, and not part of the estate of His said Majesty Kamehameha IV., and deny the same to be true.

4th.   They admit the seventh, eighth and ninth subdivisions

of said bill of complaint. They deny the then Minister of Finance, believing all the private property of the estate of His said Majesty Kamehameha IV. had been sold, issued the bonds of the Hawaiian Government to the sum of $27,000 and paid the sum realized from said bonds to various persons then having liens and mortgages upon the Royal Domain, and extinguished and released the same; and say that bonds to said amount were issued to the Commissioners of Crown Lands as a loan, upon the security of a charge upon the revenues of said Crown lands.

5th. They deny the eleventh subdivision of said bill of complaint, and allege and say that the mortgage therein mentioned was paid by the Commissioners of Crown Lands, and that there was contained in said mortgage two certain other pieces of property, to wit, the Ahupuaas of Pupukea and Paumalu, situate in the District of Koolauloa, Island of Oahu, and which were at that time and are now part of the Royal Domain, or so-called Crown Lands, and that said payment was made in order to release said lands from said mortgage, and was not paid by mistake.

6th. They admit the execution of the deed set forth in subdivision (12) of said bill of complaint, but deny that the same was made under the belief or for the consideration named in said paragraph.

7th. To the (16) subdivision of said bill of complaint they say that they do not know whether said bonds or the interest thereon have been paid or not.

8th. And these defendants further answering say that they admit that proceedings were taken by the said Emma Kaleleonalani and the said Ruth Keelikolani as in said bill of complaint alleged, and that judgments were rendered in said actions as therein set forth.

9th. And these defendants further answering say that the said sum of $27,000 is not chargeable upon the premises in said bill of complaint set forth as in said bill of complaint alleged, in that the same was assumed by the Hawaiian Government by resolution of the Legislature, approved the 6th day of July, 1866,

and that no lien in .equity exists in favor of complainant in the premises.

Wherefore they pray to be dismissed hence with their costs.

Messrs. *F. M. Hatch* and *C. Brown,* for respondents say :

I.   Upon the facts shown at the hearing it is respectfully submitted that the Hawaiian Government is not entitled to be subrogated to the rights of the mortgagee under the mortgage given by Wm. Webster to J. Mott-Smith, dated March 2, 1863.

The Legislature was not acting under compulsion to protect any existing title in the Government, therefore the doctrine of subrogation does not apply.   See Sheldon on Subrogation, Sec. 11.

Neither was the Government a creditor of the estate of Kamehameha IV., nor a surety, nor did it have such an estate or interest in the subject matter as would bring it within the limits of the rule established by courts of equity.

*Webster's Appeal,* 86 Penn. St., 409; *Unger vs. Leiter,* 32 Ohio St., 210; *Sanford vs. McClean,* 3 Paige, 117; *Shinn vs. Bodd,* 14 N. J. Eq., 234; *Woods vs. Nilson,* 17 Ill., 218; *Kitchell vs. Mudget,* 37 Mich., 82; *Moody vs. Moody,* 68 Me., 155; *Mosier's App.,* 56 Penn. St., 76.

The mortgage was not paid at the instance of the debtor, or of his administrator, nor from the circumstances of this case can it be inferred that it was the intention of the parties that the Government should be entitled to the security.   The contrary is the case as expressed by the Joint Resolution of 1865.   *Candle vs. Murphy,* 89 Ill., 352.   The Hawaiian Government was not secondarily liable for the debt secured by the mortgage, nor in any way liable; it cannot therefore claim the right of subrogation.   Bispham's Principles of Equity, Sec. 335 and authorities there cited.   See also Sec. 336.

II.   There was no mistake.   The mortgage in question was upon two Crown lands, Paumalu and Pupukea, as well as Honolulu Hale.   The mortgage was not then due.   The mortgagee could not be compelled to release any part of his security

45

There was no other method in which these two Crown lands could be released from the mortgage than by paying the debt. The Commissioners were bound by law to take up this mortgage. Acting directly in accordance with the law, there is no possibility of saying they acted by mistake. The case is therefore entirely different from that presented on demurrer.

The most that can be said is that in carrying out the law a benefit has incidentally resulted to others. Suppose there had been sureties upon this note? The payment by the Crown Commissioners would have been a benefit to them. Could they be held to contribute? The private estate had been exhausted when this mortgage was taken up. There is no evidence that there was any estate available for the administrators to dispose of.

The Connecticut cases which have been cited, of the payment of money to another under mistake, are not all in point, because the money had to be applied as it was to carry out the Act.

The transaction was simply a loan by the Government to the Crown Commissioners. There was no intention to keep alive the mortgages which were paid by the loan. The contrary is the fact. The money was advanced for the purpose of extinguishing the mortgages. They cannot be kept alive by operation of law for the benefit of the Treasury, because an express contract was made for the repayment of the loan, and security was taken. The payment was made a charge upon the income of the Crown lands. Conventional subrogation upon payment of a debt and a remedy for the payment itself cannot co-exist. Sheldon, Sec. 249. The latent equity was displaced by express contract. Or, in other words, the equitable lien, if any existed, was lost by taking security. Overton on Liens, Sec. 209.

Lien lost by taking security : *Berger vs. Potter*, 32 Ill., 66 ; *Gilman vs. Brown*, 1 Mason, 214 ; *Willams vs. Roberts*, 5 Ohio, 35.

Taking notes a waiver of a lien for rent : *Hop Sing vs. Kam On*, 7 Hawn., 138.

It is further urged that when the Legislature by the Act of 1866 released the Commissioners of Crown Lands from liability

to pay the loan, it extinguished the debt. The Act was an acknowledgment of accord and satisfaction. All that the Court can now consider is the legal operation of that Act. The motives of the Legislature or the persons intended to be benefited cannot control the plain language of the law. It can hardly be claimed that the Court could set aside this Act on the ground that it was passed under a mistake, yet in no other manner can its effect be avoided. There is no ambiguity about the Act. It is a simple release and results to the benefit of those liable secondarily, as well as the principal debtor.

Counsel for the plaintiff insists that a lien results from the payment by the Government of certain money to the use of defendants' ancestor. This may be a foundation for a suit for money had and received, but it cannot constitute a lien. The only lien which possibly could be set up would be the lien of the mortgage under subrogation. Approached from this standpoint, all of the parcels of land in the mortgage must be charged pro rata with the payment. An account of rents must also be taken. If the Government can maintain this suit in its own name, it must be chargeable with rents which have been received by the tenant put into possession by them. But it is again urged that the Government dealt solely with the Crown Commissioners. The latter took up this mortgage and went into possession. It is true they took it up with money loaned to them for the purpose, but that does not give the lender any standing in Court. This consideration seems to have additional force because the account between the lender and borrower is certainly settled.

## BY THE COURT.

Having in my decision on the demurrer (6 Hawn., 579), gone thoroughly into the question of law involved in this case, a brief decision on the merits is all that is now necessary.

I find that the plaintiff has proved all the essential facts alleged in its petition.

While fully adhering to the view taken by me on the demurrer, that the doctrine of subrogation " is not to be applied in favor of one who has officiously and as a mere volunteer paid the

debt of another, for which neither he nor his property was answerable, and which he was under no obligation to pay," I am of opinion that the people of this Kingdom as represented by its Legislature had an interest in the Royal Domain sufficient to take them out of the attitude of "officious volunteers."

The preamble of the Act of January 3d, 1865, entitled " An Act to relieve the Royal Domain from encumbrances, and to render the same inalienable," recites that "the history of said lands shows that they were vested in the King for the purpose of maintaining the Royal state and dignity, and it is therefore disadvantageous to the public interest that the said lands should be alienated or the said Royal Domain diminished," states correctly the position.

The people have an interest in maintaining the Sovereign in a state suitable to his condition, consistent with the traditions and means of this country, and it having been decided by the Supreme Court and affirmed by the Legislature that the Royal Domain or "Crown Lands" descended to the successor to the Royal office, and not to the personal heirs or devisees of the Sovereign, it is apparent that the people had an interest in them to protect. For if the rents from the Crown lands were devoted to the payments of the debts of the former Sovereign, or if they were sold for the same purpose, it would necessitate a larger vote of the public funds for the privy purse.

Therefore, when the Legislature by the resolution of July, 1866, assumed the payment of the remaining debts of the late King, it was protecting the Crown lands from further diminution, and was not a mere volunteer. Moreover, the consent of the King (K. V.) to the provision of the law rendering the Crown lands thenceforth inalienable, and therefore a permanent estate from which to support the Sovereign, was a good consideration for the nation's gift of the money. But this gift was upon the condition that the private estate of the late King (Kamehameha IV.) should be first exhausted in paying his debts.

Section 1 of the Act of January 3d, 1865, provides that the exchequer bonds shall be issued " to be used to extinguish those

mortgages (on the Royal Domain) which may remain unsatisfied after the administrator of His late Majesty's estate has exhausted all the estate belonging to His late Majesty in a private capacity, which the said administrator may be legally entitled to use for the payment of the debts of the estate." But a number of pieces of land, including Honolulu Hale, were the private property of the King, they not being in the reserved list, but having been awarded to Kamehameha III. by the Land Commission.   These were believed to be Crown lands and were not sold.   The error was a common one, participated in by the administrator, the then Ministry and the Probate Judge.

The money ($27,000), then, was paid from the public treasury under a mistake, that there was no remaining private estate of Kamehameha IV., and that all the lands which were included in the mortgage to Dr. J. M. Smith paid off by the treasury were Crown Lands.   It is not important, in my opinion, that this mortgage was upon " Honolulu Hale," a private land of the King, and also upon " Pupukea " and " Paumalu," Crown lands.

" Honolulu Hale" should have been sold by the administrator before the Minister of Finance could legally advance a dollar of the public money towards discharging the mortgage on the Crown Lands.   It was not the object of the Legislature to benefit the then heirs-at-law of the late King, but only the reigning Sovereign.   But the heirs have been benefited by the retention to them of Honolulu Hale, which, if the mistake had not occurred, would have been sold to pay the King's debts.   I think it is consonant with equity and good conscience that the Government should now recover the value of the said property at the time the mortgage upon it was released.   But the long delay in making the claim makes it inequitable that the Government should recover interest.

I will sign a decree declaring the Government to be entitled to a lien upon the Honolulu Hale premises to the extent of its value at the time the mortgage was released, which I find from the evidence to be $8,000; other particulars of the decree to be in accordance with the prayer of the bill as amended.

*P. Neumann* and *C. L. Carter*, for plaintiff.

*F. M. Hatch* and *C. Brown*, for defendants.